Evans v. Haefner.

Evans, Appellant, v. Haefner *et al.*, Respondents.

1. Where land is condemned in behalf of a railroad company, the validity of such condemnation can not be called in question in a collateral proceeding.
2. In proceedings instituted by a railroad company to obtain the condemnation of private property, the court, on confirming the report of the commissioners, ordered the plaintiff to deposit the compensation assessed forthwith with the clerk of the court to the credit and on account of the defendant. The clerk tendered the money to the attorney of the defendant and he refused to receive it. *Held,* that the company was justified in entering upon and taking possession of the land condemned.
3. Where land is condemned in behalf of a railroad company, the decree of condemnation, it seems, vests in the company the title to the earth and minerals found above the grade of the road, and whose excavation is necessary for the construction of the road; minerals lying below the level of the road, and whose excavation is not necessary in the construction of the road, belong to the owner of the land condemned.

*Appeal from Washington Circuit Court.*

This was an action to recover possession of certain lands and damages for entering the same and cutting down and destroying timber, and for digging up and carrying away rock, stone, mineral and gravel, &c. The defendants based their defence upon a condemnation of the land in controversy in certain proceedings instituted in the Washington circuit court in the name and in behalf of the St. Louis and Iron Mountain Railroad Company against the plaintiff and his wife. In these proceedings the land sued for was condemned, and the court, in its order confirming the report of the commissioners, made the following order: "It is further ordered that the plaintiff deposit in the hands of the clerk of this court, William A. Matthews, forthwith, to the credit and on the account of the defendants, the said sum of nine hundred and twenty-five dollars, to be paid over to the defendants as their compensation; and upon the plaintiff depositing said sum as aforesaid, it shall be entitled to enter upon, take possession of and use the said land, for the purposes aforesaid, during the continuance of its corporate existence." These proceedings were instituted in April, 1858.

10—VOL. XXIX.

The defendants also adduced in evidence the following instrument: " January 15, 1858. Whereas George B. Cole, Israel McCready, John Deane, J. H. McIlvaine, Andrew Casey, Samuel Singer, J. H. Morse and Thomas C. Johnson, a committee appointed by the citizens of Potosi, in the county of Washington, acting for themselves and such others as shall coöperate with them, parties of the first part, have proposed to the St. Louis and Iron Mountain Railroad Company, party of the second part, to establish a branch road from the main line of the St. Louis and Iron Mountain Railroad to Potosi, by the nearest and most practicable route; and whereas the said railroad company is willing to establish and locate said branch upon the considerations hereinafter named: Now, therefore, these presents witness: 1. That the said parties of the first part, for themselves, said citizens, hereby agree to and with the said railroad company to do the graduation, masonry, bridging, ballasting, clearing and grubbing, and all other work necessary to prepare said branch road for the laying of the track thereon. 2. The said parties of the first part further agree at their own expense to procure the right of way, and the necessary depôt grounds, and to cause the same to be conveyed to said company. 3. The said branch road shall be located upon the shortest, most practicable and cheapest route to be designated by the engineer of the St. Louis and Iron Mountain Railroad Company acting in concert with an engineer appointed by the said parties of the first part. 4. The cost of making the preliminary surveys on said route shall be paid by said railroad company except the wages of the engineer appointed by the parties of the first part. 5. When the graduation, masonry, &c., and all other work necessary to prepare said road-track for the laying of the rails shall be completed, delivered and accepted by said company, then the said party of the second part binds itself to furnish the iron rails, ties, spikes, &c., and to proceed without delay to lay down and complete said track, to erect the necessary buildings, provide rolling stock, and proceed to operate said road. 6. It is further agreed that said

railroad company shall have the entire control and management of said road, and the regulation of the rates for passengers and freight thereon. 7. The said branch when completed shall, together with the appurtenances thereto, become the absolute property of the St. Louis and Iron Mountain Railroad Company. 8. The grade of such branch road shall not exceed seventy feet per mile. 9. When said road-bed, masonry, &c., are completed, delivered and accepted by said railroad company, the cost thereof shall be estimated by the engineers of both parties, not to exceed the cost of similar work on the main line ; and, in case they can not agree, a third engineer shall be selected by them as umpire, and the decision of the majority shall be final. For the amount so fixed the said railroad company shall issue its stock to such persons and in such amounts as shall be directed by a committee of the citizens of Potosi. 10. The graduation, masonry, &c., on said branch road shall be commenced by the citizens of Potosi within three months and completed within twelve months from the date hereof. 11. If, at any time within which the work is to be commenced as above, it shall be found impossible to raise the necessary subscription among said citizens to complete said work, then the parties of the first part shall have the right to terminate this contract by notice in writing to said railroad company within said period. In testimony whereof," &c.

The St. Louis and Iron Mountain Railroad Company gave to Wm. Carter the following authority to procure the condemnation of the right of way for the Potosi branch railroad : " The undersigned, president of the St. Louis and Iron Mountain Railroad Company, hereby authorizes William Carter, Esq., the attorney at law employed by divers citizens of the town of Potosi, to use the name of said company in all necessary legal proceedings to procure the condemnation of the right of way for the Potosi branch of the S. L. & I. M. R. R. It is expressly understood, however, that the said company shall in no event be held responsible for the professional fees of the said attorney, nor for any costs or expenses

ses attending the procurement of said right of way, but the same are to be wholly borne by the said citizens of Potosi. [Signed] Madison Miller, president. St. Louis, March 29, 1858."

The trespasses complained of were committed by the defendants in entering upon the land of plaintiff under the authority of the above contract for the purpose of constructing said branch railroad track. It appeared that some gravel was dug up for embankment purposes outside the line of the road as condemned.

The court, at its own instance, gave the following instructions to the jury : " The judgment of the court rendered at the May term, 1858, in the proceedings of the St. Louis and Iron Mountain Railroad Company to condemn the roadway of the branch road through the land and town lots of the plaintiff, and the deposit of the amount of money required by said judgment with the clerk, was a complete investiture of the company of the title to the land condemned from the date of said deposit, and is a full justification to the company, her agents and contractors, to enter on the land thus condemned, and construct their road, doing no damage to the adjoining land of the plaintiff; and such judgment precludes all inquiry by the jury into the value of the land taken or the damages done to the adjoining land in consequence of the location of said road, the same having been adjudicated and settled by the judgment aforesaid. The damages sustained by the plaintiff for taking and using the gravel on adjoining land, and any injury done to the adjoining lands, by throwing down and keeping open the fences, if proven to have been done by the contractors or their hands, the defendants are liable therefor ; and the jury will find for the plaintiff such amount therefor as, under all the circumstances, they may think right. The contract of the defendants with the St. Louis and Iron Mountain Railroad Company read in evidence is a full authority from the company to them to enter upon the said roadway and construct their said branch road. Although the defendants were entitled to

pull down the fences along the line of said road for the purpose of constructing their road, yet they could not by law do so in such manner as to expose his enclosed lands adjoining, but must keep up the fences so as to prevent such exposure, or they will be liable for any damages resulting from such exposure. The title vested in the company by the judgment aforesaid conferred on the company the right to all mineral, &c., found within the line of said roadway."

The plaintiff asked the court to instruct the jury as follows: "1. The St. Louis and Iron Mountain Railroad Company has no legal right to transfer their privilege of condemning private property to their use; and the contract of the 15th of January, 1858, read by defendants, and the written authority to Wm. Carter, dated March 29, 1858, confer no privilege on defendants to use the name of the company to condemn the plaintiff's land for the use of the Potosi branch road; and the proceedings had under said contract and authority, as read by defendants, constituted no defence to the action. 2. As to the trespass that may have been committed by defendants or their agents, or under their direction, outside of the eighty feet constituting the road-bed, the jury will find such damages as they believe the material taken was reasonably worth and the injury sustained will justify. 3. If the jury find from the evidence that the defendants or their agents or employees entered upon plaintiff's land as alleged in the petition and withheld the same from plaintiff, then they will find the defendants guilty and assess such damages as from the evidence it appears plaintiff has sustained. 4. There is no evidence before the jury that the St. Louis and Iron Mountain Railroad Company had any authority to construct the Potosi branch road mentioned in the defendant's answer. 5. The defendants, having failed to prove any tender of the damages assessed to plaintiff by the commissioners, are not justified in their entry upon plaintiff's lands. 6. Payment of the money in court and tendering the same to plaintiff's attorney is not a lawful tender in this case." The court refused so to instruct.

The jury returned the following verdict : " We, the jury, find the defendants guilty of the trespass complained of, except as for the land included in the roadway of the St. Louis and Iron Mountain branch railroad, and assess the plaintiff's damages at twenty-six dollars."

*Noell* and *Perryman*, for appellant.

I. The charter of the St. Louis and Iron Mountain Railroad Company, approved March 3, 1851, does not authorize the construction of the Potosi branch. (Sess. Acts, 1851, p. ⸺ ; Sess. Acts, 1837, p. 273.)

II. If the charter does confer authority to construct branches, the power to condemn land for that purpose, if given at all, is given to the company for the public benefit. The power can not be transferred, farmed out, or assigned to anybody or party of men. Nor can the company loan the use of its name for that purpose. The project of constructing a branch road was a project of a few citizens of Potosi. The purposes for which the land was taken were private. (Dickey v. Tennison, 27 Mo. 373.)

III. The deposit of the damages assessed with the clerk of the court did not invest the company with the title. The instruction given was erroneous.

IV. The court erred in directing that the mineral found in the roadway became the property of the railroad company. The company obtained the right of way only.

V. The general law of this state giving to all existing railroad companies the privilege of taking private property is unconstitutional. A distinction should be taken between a special provision in the charter of a railroad company, the public purposes and objects of which appear on the face of the charter, and a general law conferring power indiscriminately on all railroad companies, without any reference to their objects, purposes or obligations. The general law imposes certain obligations on railroads organized under the act. These obligations are not imposed upon the chartered roads. (See Redfield on Rail. 14 ; United States v. Arre-

dondo, 6 Pet. 691.) Upon what principle can it be said that a railroad a little over three miles is a work of public necessity.

*Cates, Frissell & Carter*, for respondents.

I. The St. Louis and Iron Mountain Railroad Company had power to make the Potosi branch. The proceedings and judgment of the court in the condemnation of the land are conclusive. The payment of the assessed damages into court gave power to said company and all others acting under them by contract or otherwise to enter on the land condemned and construct said railroad. The defendants had power and license from the company to grade and prepare said branch road for the laying of the track. Said company had the power to dig minerals, timber, &c., within the bounds of the land condemned, but not to convert the same to their own use. There was no error in refusing the instructions asked.

Scott, Judge, delivered the opinion of the court.

This was an action of ejectment and trespass *quare clausum fregit*, to recover the possession of some land and for damages for entering lands belonging to the plaintiff. The defendants, under a contract with St. Louis and Iron Mountain Railroad Company, built a road connecting Potosi, in Washington county, with the main stem, not exceeding three or four miles in length. The company had the land, on which the defendants built the road, condemned under the provisions of the general railroad act, approved February 24, 1853.

It is now objected to the condemnation that the charter of the St. Louis and Iron Mountain Railroad Company did not authorize the building of the branch road from Potosi to the main stem; that the company could not delegate to the defendants the right to construct the branch road; that it was a private enterprise of no public utility, for which private property could not be taken.

Waiving the inquiry whether these objections are well founded in the law and the facts, we will examine whether the propriety of the proceedings taken for the condemnation of the land of the plaintiff can be inquired into in this action. The condition of railroad companies would be a hard one, if they could not be assured, before a road was built, that they might rely with confidence on the validity of the condemnation under which they acted. If the law, under which they proceed, is a valid and binding one, and they conform to its provisions in condemning the land necessary for their purposes, it would be ruinous if the validity of those proceedings could be called in question in a collateral suit. One of the consequences of holding that a party could be held liable as a trespasser or a wrongdoer while acting under a condemnation conformable to the statute, would be that the party complaining of the injury might, in the exercise of his rights of peaceably redressing his own wrongs, enter upon a railway and abate it as a nuisance. (3 Blackf. 5.) A railroad company would never be safe in building a road. After condemning land under a law which authorized it, they would be left to the fluctuating opinions of the courts, and would have no assurance that the steps they had taken would be of any avail in a subsequent action against them. If the construction of railroads is a measure encouraged and promoted by the community as one in which its interests are involved, there would be no policy in leaving companies in this defenceless state. There is no hardship in this on him whose property is condemned for the public use. The legislature can exercise the right of eminent domain, providing just compensation for private property taken or applied to public use. They can make laws providing how this right shall be exercised. If the party to be affected by the exercise of it has notice, he can make all objections to the proceedings of the body discharging this duty. If he fails to make objections, or if his objections are made and overruled, on what ground can he recur to those objections in a collateral action? If, when the proceedings condemning private

property for public use are reported and confirmed, they do not protect the companies entering on the land taken, of what use are they? In building roads companies should have an assurance that they are not at the mercy of those whose property may be applied to their use. The statute, under which the proceedings were had in this case, declares that they shall be final and conclusive. In the case of Hamilton v. The Annapolis and Elk Ridge Railroad Company, 1 Mary. Ch. 107, it was held that, the land having been condemned for the use of the road, and the inquisition returned to and duly confirmed by the proper county court, the propriety of the condemnation and use of the property could not be drawn in question in an incidental or collateral proceeding. The law is stated to the same effect in Redfield on Railways, 129, 684.

We see nothing erroneous in the conduct of the court in relation to the payment or deposit of the damages assessed to the plaintiff. The statute provides that the court shall direct to whom the money is to be paid, or in what bank or banking house, and in what manner it shall be deposited by the company. The order made was, that the company deposit with the clerk of this court forthwith, to the credit and on account of the defendants, the said sum of nine hundred and twenty-five dollars, to be paid over to the defendants. This was in effect an order directing the money to be paid to the defendant; and, if he refused to take it, we see no impropriety in its remaining with the clerk to be paid when called for. The clerk stated that he still holds the money ready for the plaintiff in this action. His attorney refused to receive the money on his account. Being a party to the proceeding, he knows where his money is, and that he can have it at any time. Under such circumstances, after doing all that could be done, it is now very unreasonable that the point should be made that the order did not justify the court in directing the jury that it was a full justification to the company to enter upon the land condemned.

The court instructed the jury that the title vested in the

company conferred on it the right to all mineral, &c., found within the line of said roadway. The land over which the road passed was mineral land. That fact, we suppose, was known to the commissioners, and they would regard it in estimating the damages assessed for the plaintiff. The mineral found below the bed of the road, and whose excavation is not necessary for the construction of it, would remain with the owner of the soil; but, as to the portion that must be removed in order to build the road, we do not see on what ground the owner of the soil can claim it, more than the earth or rock that is removed. We do not see on what principle the ownership of the excavations can be made to depend on the question whether they are necessary or not in the building of the road. When 'the land is condemned, it is condemned to the bed of the' road, and the property of that which is condemned vests, when the damages are paid or secured, without regard to the inquiry whether or not it will be necessary in the construction of the road. Whether the instruction of the court was right or wrong, as it appears that no mineral was taken from beneath the level of the road, the plaintiff was not injured by it. If the excavations belong to the owner of the soil, would it not be right to place them on his ground, and how then would he complain that his land had been injured by placing them upon it? Are not railroad companies sued for such injuries? Redfield says, " It is certain in this country, upon principle, that a railroad company, by virtue of their compulsory powers in taking lands, could acquire no absolute fee simple, but only the right to use the land for their purposes; and it is very questionable whether a railway, in such case, is entitled to the herbage growing upon the land, or to cultivate the same, or to dig for stone or minerals in the land beyond what is necessary for their purposes in construction. In England, the statutes give all such minerals to the former owner of the land, except such as are necessary in the construction of the road, unless the same shall have been expressly purchased; and in this country, no doubt the same construction would

Evans v. Haefner.

be adopted in regard to all land taken by compulsory proceedings."

We do not see how the constitutionality of the general railroad law of February 24, 1853, can arise in this or any other case, when it is admitted that there may be roads to which its provisions may be constitutionally applied. It is conceded in the argument that the act would be constitutional when applied to the Pacific railway, because that road is for the general benefit, and private property may be taken for its use. But it is maintained that the same act is unconstitutional when applied to the road the subject of this controversy, because it is a mere private enterprise in which the public have no concern, and therefore private property can not be taken for its use. If the road was of the character attributed to it, and lands should be condemned for it, that would not show that the general law is unconstitutional, but only that its provisions had been perverted to a case to which they could not be constitutionally applied. The constitutionality of a law depends upon the terms in which it is written. If there is a state of circumstances to which it may be applicable consistently with the constitution, it is no argument against its validity that it may be perverted to cases not warranted by the constitution. If the law is applied to such a case, that does not make it invalid, but only shows that it has been misconstrued and perverted to a case to which, by the constitution, it was not applicable. The constitutional validity of a law can not depend on extrinsic facts or circumstances, but those facts and circumstances may determine the constitutionality of its application to any particular case. It follows, then, that whether the general railroad law could be made applicable for the condemnation of the road, the subject of this controversy, was a question involved in the proceedings of the commissioners; and as those proceedings stand confirmed, it, no more than any other question involved in them, can be made a subject of investigation in this controversy, they being final and conclusive. Judgment affirmed; the other judges concur.